Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____ )
                                    )
In re:                              )
                                    )
WESTINGHOUSE ELECTRIC COMPANY,      )
LLC et al.,                         )   Chapter 11
                                    )   Case No. 17-10751
            Debtors.                )   (MEW)
                                    )
_____        )
                                    )
                                    )
FLUOR ENTERPRISES, INC.,            )   Adv. Proc. No.
                                    )   18-01635 (MEW)
            Plaintiff,              )
                                    )
VS.                                 )
                                    )
W WIND DOWN CO, LLC                 )
                                    )
            Defendant.              )
_____)


VIDEOTAPED DEPOSITION OF DAVID DURHAM
Wednesday, May 29, 2019


VIDEOTAPED DEPOSITION OF DAVID DURHAM, a witness herein, taken in accordance with Pennsylvania Rules of Civil Procedure No. 4007.1, by and before Dutcheen O. Cameron, RMR, CRR, and Notary Public in and for the Commonwealth of Pennsylvania, at the offices of Westinghouse Electric Company, 1000 Westinghouse Drive, Cranberry Township, Pennsylvania, 16066, on Wednesday, May 29, 2019, at 9:32 a.m.

18-01635-mew   Doc 51-4   Filed 08/13/19   Entered 08/13/19 21:19:34   Exhibit C -
Deposition of David Durham (Excerpts)   Pg 2 of 3
David Durham - May 29, 2019

4 (Pages 10 to 13)

**Page 10**

1   A.   Until -- until the last three years,
2   yes.
3   Q.   And that would be the last three years
4   when you were at Westinghouse?
5   A.   At Westinghouse, correct.
6   Q.   So did your role change while you were
7   at Fluor, or did it stay the same the whole time?
8   A.   It was predominantly the same but
9   chasing different markets.  First it was Department
10  of Energy.  Then it included the UK's cleanup
11  market, a Russian sub decommissioning program, and
12  then it switched to nuclear new build.  So
13  commercial utility work.
14  Q.   Why did you leave Fluor?
15  A.   You know, I -- we had won a new build
16  job partnered with Toshiba, and it appeared the
17  market wasn't really going to expand the way we had
18  assumed.  And I kind of just felt like I had done
19  everything I was going to do, and so GE Hitachi
20  offered a promotion in a different -- in a
21  different market doing different things.  I was
22  just ready for a change.  I had done the same basic
23  job for about 11 years so. . .
24  Q.   What was that particular job with
25  Toshiba?

**Page 11**

1   A.   South Texas project.
2   Q.   Was that something referred to as STP?
3   A.   Yes, ma'am.
4   Q.   Who did you work with on that project at
5   Fluor?
6   A.   Oh gosh.  Obviously Ron Pitts because he
7   was the head of operations.  Counselor at the other
8   end of the table, Jude.  Chris Tye.  I mean -- I
9   mean, I don't remember all the people.
10  Q.   And how did that -- do you know how that
11  job ended up, the South Texas project, what
12  happened?
13  A.   I know what I -- either what I had been
14  told by people at Fluor or what I read in the
15  paper.
16  Q.   What is that?
17  A.   That Toshiba insisted that Fluor invest
18  as an owner in the project, that Fluor wasn't
19  willing to do that, that the Shaw Group was willing
20  to do that, and so Toshiba replaced Fluor with Shaw
21  who then invested in a couple hundred million
22  dollars and lost every penny of it.
23  Q.   Did -- was it your understanding that
24  when you say they, that Toshiba switched to Shaw,
25  that they terminated Fluor for convenience under

**Page 12**

1   the contract?
2   A.   I don't know.
3   Q.   Could you tell me what you did, please,
4   Mr. Durham, to prepare for the deposition today?
5   A.   I received a briefing on the process
6   from our counsel, and that's about it.
7   Q.   From -- and by your counsel do you mean
8   Mr. Swanson?
9   A.   Dave Mura.
10  Q.   And I don't want to get into the
11  substance of what you discussed with Dave Mura.
12  A.   Just the process.
13  Q.   Just the process.  Do you know anything
14  about the dispute between Wind Down Co. and Fluor?
15  A.   All I know is that Fluor filed suit for
16  lost -- for -- claiming lost profits and I read the
17  Complaint when it first came out and since then
18  I've, quite frankly, done nothing.
19  Q.   Have you read -- have you read anything
20  other than Fluor's initial pleading?
21  A.   No.  No.
22  Q.   Have you gone back and looked at any of
23  the agreements or any of the e-mails?
24  A.   No.
25  Q.   Has anyone asked you whether you have

**Page 13**

1   any e-mails relevant to this?
2   A.   I think I was given a -- I don't know
3   what the right terminology is, but a save --
4   document save e-mail order when the suit was first
5   filed.  That's all.
6   Q.   Document preservation notice?
7   A.   Thank you.  Thank you.  Yes, that's
8   correct.
9   Q.   In your job is it your practice to take
10  handwritten notes?
11  A.   It is.  Usually.  Not always.  Usually.
12  Q.   What do you do with those notes, just
13  typically?
14  A.   I typically save them during the process
15  and then at some point, months or a year or two
16  later, I throw everything away.
17  Q.   Did you take notes of your discussions
18  with people at Fluor relative to the projects that
19  bring us together today, the South Carolina and
20  Georgia plans?
21       MR. SWANSON:  Objection to form.
22       MR. BEREZIN:  Join.
23       MR. SWANSON:  You can answer.
24  A.   I sometimes took notes, not always.
25  BY MS. BAUM:

18-01635-mew    Doc 51-4    Filed 08/13/19    Entered 08/13/19 21:19:34    Exhibit C -
Deposition of David Durham (Excerpts)    Pg 3 of 3

David Durham - May 29, 2019

5 (Pages 14 to 17)

Page 14

1  Q.  Do you still maintain any of those
2  notes?
3  A.  I haven't searched through -- I know
4  that in my files in Charlotte I do not. I have not
5  searched through a couple of boxes that are still
6  here in Pittsburgh. I don't know if there are
7  notes in there or not. I did purge a lot of things
8  a couple years ago, quite frankly.
9      MS. BAUM: Counsel, Mr. Swanson, if -- I
10 think any of those notes either of conversations
11 with Fluor or of conversations with people
12 internally would be called for under our subpoena,
13 so I'd request that those -- be sure that those not
14 be destroyed and they be searched and provided to
15 us if there's anything responsive in them.
16     MR. SWANSON: Okay. Understood.
17 BY MS. BAUM:
18 Q.  Have you destroyed any handwritten notes
19 in the last year?
20 A.  No. Not about this matter.
21 Q.  Do you understand whether in connection
22 with Fluor's dispute with Wind Down Co. your
23 employer has any financial interest whether direct
24 or indirect in the outcome of that matter?
25 A.  I don't have personal knowledge. I've

Page 15

1  been told we do not.
2  Q.  Did you work with Colleen Grygier while
3  she was --
4  A.  I did.
5  Q.  -- employed at Westinghouse?
6  A.  I did.
7      MR. SWANSON: Let her finish her
8  question.
9      THE WITNESS: Sorry.
10 BY MS. BAUM:
11 Q.  And when I talk about this project, can
12 we have an understanding that we are talking -- we
13 are here talking about the Vogtle and Summer
14 projects on which Fluor was engaged to provide
15 services for Westinghouse?
16 A.  Of course.
17 Q.  Other than working on that project, had
18 you worked with Miss Grygier prior to those
19 particular projects?
20 A.  No. Because I was hired specifically to
21 -- and immediately started talking to Fluor. So, I
22 mean, that's what I was hired to do. I hadn't been
23 at Westinghouse prior to that so I --
24 Q.  Sorry. Go ahead.
25 A.  So I just had no -- I didn't meet her

Page 16

1  until I started working at Westinghouse.
2  Q.  When you say "that's what I was hired to
3  do," what do you mean by that?
4  A.  I was hired to help negotiate the
5  arrangements with Fluor and then the acquisition of
6  our former construction partner -- Westinghouse's
7  former construction partner and then with the
8  agreement that I would then lead that company once
9  we acquired it.
10 Q.  Okay. Since Fluor filed its claim, have
11 you spoken to anyone on behalf of Wind Down Co.
12 relative -- about this matter?
13 A.  I can't speak on behalf of Wind Down Co.
14 I can only speak on behalf of Westinghouse.
15 Q.  Right. Maybe my question wasn't clear.
16 Since Fluor filed its claim in the bankruptcy court
17 related to the Summer and Vogtle projects, have
18 you, personally, had any conversations with anyone
19 who was representing Wind Down Co.?
20 A.  No, I don't think so.
21 Q.  Other than your counsel in this case,
22 have you had conversations with anybody about
23 Fluor's claims or the positions that the parties
24 are taking in those claims?
25 A.  My wife. I honestly don't remember if

Page 17

1  I've spoken to anybody else. I don't think so.
2  Q.  I want to go back to your statement that
3  you were hired to help with the negotiations --
4  hired by Westinghouse to help with the negotiations
5  with Fluor. When specifically did you begin
6  working for Westinghouse?
7  A.  July something of 2015, towards the end
8  of the month.
9  Q.  And when you say that you were hired for
10 that purpose, could you tell me, please, to the
11 best of your recollection, what you were told by
12 Westinghouse about its reasons for hiring you?
13 A.  I had worked with Westinghouse's then
14 CEO at GE Hitachi, so we knew each other very well.
15 Q.  Is that Mr. Roderick?
16 A.  Yes, it is. And he knew of my
17 background, he knew of my capabilities. We didn't
18 go into a lot of detail as to why he was hiring me.
19 He told me what he wanted me to do and, I mean,
20 that sounded interesting. I knew that Westinghouse
21 was in trouble on these projects and that our
22 efforts to take over the business of CB&I and that
23 -- I say acquisition, but we didn't pay anything
24 for it, that's why I use the word takeover. And
25 then to bring Fluor in as a replacement